IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| MANIFEST CORPORATION, an Oregon corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Case No. 07-254-KI |
| vs. | ) ) | OPINION AND ORDER |
| RANDOM HOUSE, INC., a New York corporation, | ) ) ) | |
| Defendant. | ) ) | |

Paul T. Fortino
Thomas R. Johnson
Kevin M. Sali
Perkins Coie, LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon  97209-4128

    Attorneys for Plaintiff

Page 1 - OPINION AND ORDER

Christopher W. Angius
Courtney C. Dippel
Holland & Knight, LLP
2300 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon  97204

      Attorneys for Defendant

KING, Judge:

Manifest Corporation ("Manifest") seeks a declaratory judgment construing a provision in an Asset Purchase Agreement between it and Random House, Inc.  Random House has filed a Motion to Compel Arbitration, Appoint an Arbitrator, and Dismiss Action (#9),[1] and a Motion to Strike Declaration of Wesley Price Submitted by Plaintiff in Partial Opposition to Motion to Compel (#45).

## BACKGROUND

Manifest, previously known as Multnomah Publishers, Inc., sold its publishing business to Random House.  The Asset Purchase Agreement set forth the terms of the sale.

The purchase price for the business was $20 million "[s]ubject to adjustment as set forth in Section 2.8."  Decl. of Michael Palgon, Ex. 1, Asset Purchase Agreement (hereinafter "Agreement") at Section 2.4.

Section 2.8 details a post-closing procedure to adjust the purchase price for Manifest's assets in the case of a difference between the value of the company's working capital[2] as

---

[1]Although Random House requested dismissal of the action in its motion, it now suggests a stay because it recognizes that the parties will want to litigate any outcome of the arbitration.

[2]Section 1.1 of the Agreement defines "Working Capital" to mean "the current assets of the Acquired Business (not including any Excluded Assets that are current assets) minus the

calculated by Manifest before the closing and the value of the company's working capital as calculated by Random House as of the closing.

Specifically, Section 2.8 directs Manifest to prepare a statement of the working capital ("pre-closing statement"). Within 90 days of closing, Random House prepares a closing statement of the working capital ("closing statement"). The Agreement instructs that the closing statement "shall be prepared in accordance with GAAP,[3] applied on a consistent basis." Agreement, Section 2.8(c).

The remainder of the arbitration provision reads, in relevant part:

Following receipt of the Closing Statement, [Manifest] shall within thirty days either (i) accept the Final Working Capital as set forth in Closing Statement in its entirety, or (ii) deliver to [Random House] a written notice (the "Objection Notice") containing a sufficiently detailed written explanation of those items in the Closing Statement which [Manifest] disputes. . . . Following delivery of an Objection Notice, the parties and, if desired, their accountants, will attempt to resolve, in good faith, any disputed items and reach a written agreement with respect thereto (the "Settlement Agreement"). If the parties fail to reach such a resolution within thirty (30) days after delivery of the Objection Notice, the unresolved disputed items will be referred for final binding resolution to an independent firm of certified public accountants acceptable to [Random House] and [Manifest] (the "Arbitrating Accountants"). Such resolution (the "Accountant's Determination") shall be (w) in writing, (x) furnished to [Random House] and [Manifest] as soon as practicable after the items in dispute have been referred to the Arbitrating Accountants, (y) made in accordance with GAAP, and (z) final and binding on [Random House] and [Manifest]. The fees and costs of the Arbitrating Accountants shall be split equally between Seller and Purchaser.

Agreement, Section 2.8(e).

---

current liabilities of the Acquired Business (not including any Retained Liabilities)."

[3]GAAP means Generally Accepted Accounting Principles.

Manifest asserts that during the sale negotiations, Random House met with Manifest employees and thoroughly discussed Manifest's method of calculating its reserve for returns, accounts receivable, inventory reserves and royalty advances.

Manifest drafted its pre-closing statement, which reflected the company's working capital to be $7,897,458 as of June 30, 2006.  According to Manifest's statement of facts, the parties jointly prepared the June 30 statement, using Manifest's accounting methodologies, and jointly settled on the working capital value.  Random House disputes this–it asserts that the Random House employee involved merely inserted Manifest's numbers into a standardized form with no knowledge of whether those values were correct.

The parties executed the Agreement and closed the transaction on August 2, 2006.  The pre-closing statement valuing Manifest's working capital at $7,897,458 was included as an exhibit to the Agreement.

Random House created the closing statement, showing Manifest's working capital to be $4,238,708 as of the closing date.

Random House explained the discrepancy to Manifest, stating that it disagreed with the pre-closing calculation for the following reasons:  reserve for returns (the value of previously-sold books that are expected to be returned to the publisher for credit); inventory reserves (amount of book inventory that is obsolete and likely to be written off); reserve for bad debts (based on historical write-off experience and the total amount of invoices over 121 days old); accounts receivable; unpublished royalty advances; and accounts payable.

Pursuant to Section 2.8(d) of the Agreement, unless it objected to the closing statement,

Manifest owed Random House an amount equal to the difference between the pre-closing

working capital and the closing working capital.

Manifest objected to Random House's closing statement, and disagreed with five of the

six issues raised by Random House.  In its written objections, Manifest's president wrote,

"According to the Agreement, the parties now have thirty days to discuss the items in dispute

before the matter of the adjustment should be referred to arbitration."  Palgon Decl., Ex. 4 at 1.

Among its objections, Manifest pointed out the following:

> Issue 3 – Inventory Reserve ($400,721)
> Seller objects to Buyer's adjustment based primarily upon the following reasons:
> - Seller's accounting was in accordance with GAAP.
> - The adjustment asserted by Buyer violates the consistency requirement of Section 2.8(c) of the Agreement.  The contract requires that the parties utilize a consistent methodology for purposes of any adjustment to this item between June 30, 2006, and the closing date.
> - Buyer's method fails to contemplate the fact that the Company, and publishers in general, will often hold and sell inventory in excess of one year's anticipated sales.
> - Buyer has otherwise failed to demonstrate why the facts and circumstances surrounding the titles, identified on a selective basis, will not sell in excess of one year's supply.

> Issue 5 – Sales Returns Reserves ($2,579,945)
> Seller objects to Buyer's adjustment based primarily upon the following reasons:
> - Seller's accounting was in accordance with GAAP.
> - The methodology asserted by Buyer violates the consistency requirement of Section 2.8(c) of the Agreement.  The contract requires that the parties utilize a consistent methodology for purposes of any adjustment to this item between June 30, 2006 and the closing date.
> - Buyer's adjustment to this reserve ignores the limitation created by Section 2.3(e) of the Agreement.
> - Buyer fails to consider elements of recovery contemplated by the reserve calculation including inventory value and recoverable royalties.
> - The curve applied by Buyer is fundamentally flawed and has the effect of artificially extending the timing of expected returns.

- Buyer's post-closing conduct or actions have likely exacerbated the
  realized returns.

Id. at 2-3 (emphasis added).

Pursuant to the terms of the Agreement, the parties met to attempt to reach a resolution.

They were unsuccessful and, on February 9, 2007, Random House alerted Manifest that it would

refer all unresolved disputed items to arbitration and attempted to confer on a mutually

acceptable accountant.  On February 21, 2007, Manifest filed its complaint.

In its First Amended Complaint, Manifest seeks the following declarations:

A.    the purpose of the Working Capital Adjustment in the parties' Asset
      Purchase Agreement is to reflect real changes in the value of working
      capital resulting from ordinary-course activities of the business between
      June 30, 2006, and August 2, 2006;

B.    with respect to disputes relating to the value of any individual Working
      Capital Item, the jurisdiction of the arbitrator is limited to deciding the
      proper value of any Working Capital Item that the parties determine
      should be sent to arbitration before an accountant of their choosing; and

C.    the arbitrator must apply a consistent accounting methodology between
      June 30 and August 2 to each Working Capital Item sent to arbitration.

First Am. Compl., Prayer for Relief at 8.

On March 26, 2007, Random House filed its Motion to Compel Arbitration.  On March

27, 2007, Manifest filed a Motion for Summary Judgment.  On April 3, 2007, Random House

filed a Motion to Stay Proceeding Pending Decision on Motion to Compel Arbitration and

Dismiss Action or Alternatively to Extend Time to Respond to Plaintiff's Motion for Summary

Judgment.  At a telephone conference on April 9, 2007, I granted the motion to stay the summary

judgment briefing pending a decision on Random House's Motion to Compel Arbitration.  At a

telephone conference on April 17, 2007, I granted Manifest's request to take some discovery,

recognizing that it might be necessary to resolve the motion. Oral argument was held on the motions on May 9, 2007.

## LEGAL STANDARDS

The Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq., was enacted "to reverse the longstanding judicial hostility to arbitration agreements." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991). The United States Supreme Court has concluded that the FAA demonstrates a "liberal federal policy favoring arbitration agreements." Id. at 25 (citing Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24 (1983)).

Under the Federal Arbitration Act, the court must determine whether a written arbitration agreement exists, whether the agreement encompasses the dispute at issue, and whether the terms are valid and fully enforceable after "applying general, state-law principles of contract interpretation." Wagner v. Stratton Oakmont, Inc., 83 F.3d 1046, 1049 (9th Cir. 1996).

Absent "clea[r] and unmistakabl[e] evidence" that the parties intended to submit the arbitrability question itself to arbitration, the court decides that question. First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995).

## MOTION TO STRIKE

Random House moves to strike Wesley Price's declaration, a declaration that Manifest submitted in support of its opposition to the Motion to Compel Arbitration. Random House asserts that the declaration is untimely and, in addition, that it presents assertions related to issues that must be decided by the arbitrator.

Manifest's opposition to the Motion to Compel Arbitration was due April 19, 2007, but the declaration was not filed until May 4, 2007. Manifest presented a cover letter with the

declaration explaining that the contents of the declaration, as well as the documents attached to it, were the product of its subpoena that was the subject of the April 17, 2007 telephone conference described above.

In a footnote in its opposition to the Motion to Compel Arbitration, Manifest explains that it "has served a subpoena on an accounting firm retained by Random House in connection with the August 2 valuation, and intends to request leave to supplement the record of this case once the requested documents are produced." Pl.'s Partial Opp. to Mot. to Compel Arbitration at 7 n.3. Manifest did not, however, request leave to file the declaration.

While it would have been prudent for Manifest to request leave to file the declaration, I do not strike it. I was aware that Manifest would be filing additional materials once it obtained a response to its subpoena. I specifically authorized it to seek some discovery relevant to its opposition, and recognize that it took some time to obtain those materials. According to its cover letter, Manifest immediately filed the declaration upon receiving a response to its subpoena.

Random House's alternative argument–that the issues raised in the Price declaration come within the purview of the arbitrator's jurisdiction–is a question resolved below and is not a basis upon which to strike the declaration.

In sum, I deny Random House's Motion to Strike Declaration of Wesley Price.

## DISCUSSION

I.    <u>Summary of the Parties' Positions</u>

The only matter at issue between the parties is the scope of the arbitration provision. In its words, Manifest agrees that,

Page 8 - OPINION AND ORDER

>       Pursuant to the parties' agreement, individual disputed working capital
> items are to be submitted to an accountant-arbitrator for valuation. Manifest does
> not contest this accountant-arbitrator's jurisdiction to perform these valuations.
> Manifest requests, however, that this Court establish the limits of the accountant-
> arbitrator's jurisdiction as set forth in the parties' narrowly drafted arbitration
> clause, and issue instructions to ensure that this jurisdiction is exercised according
> to the parties' objectively manifested intentions.

Pl.'s Partial Opp. to Mot. to Compel Arbitration at 1.    To sum up Manifest's concern, it believes

that the pre-closing statement and closing statement should use the same accounting

methodologies to reflect changes occurring between the time the parties agreed to a sale price and

the date of closing.  It is worried that an arbitrator might conclude that a particular accounting

method is more suitable than the one used by Manifest to value a particular item in its pre-closing

statement, even if both methods are consistent with GAAP.

Random House, on the other hand, contends that "it is precisely the failure of Manifest to

apply GAAP in its calculation of Working Capital in the Interim Financial Statement submitted

by it to Random House that is the core of the dispute between the parties." Def.'s Reply Mem. at

2.  It contends that the arbitrator would have to determine whether the pre-closing statement is

consistent with GAAP and, if not, restate the pre-closing statement to make it GAAP-compliant.

Random House seeks an order compelling Manifest to arbitrate this dispute, and

designating an arbitrator to resolve the dispute.[4]   Besides requesting the declarations set forth

above, Manifest agrees that the court should appoint an arbitrator.

---

[4]Random House also seeks its attorney fees, costs, and expenses, pursuant to Section 9.12
of the Agreement.  I agree with Manifest that this is an issue to be decided by separate motion.

II.    <u>Whether the Declarations Sought by Manifest Come Within the Purview of the Clause</u>

Manifest seeks three declarations amounting to a request that the court require the consistent application of an accounting methodology to capture changes in value from pre-closing to closing, although Manifest characterizes its request as one asking for this court to interpret the "purpose" of the working capital adjustment.

As more fully set forth above, the Agreement contains a specific procedure by which the working capital is to be determined.  Under the Agreement, Manifest prepares its pre-closing statement, and Random House prepares its closing statement.  If Manifest disputes any items in the closing statement, it prepares a notice of objections and, if the parties cannot resolve by themselves the disputed items raised by Manifest, its objections are referred to an arbitrator.  The Agreement instructs the arbitrator to settle "the unresolved disputed items" raised in Manifest's "sufficiently detailed written explanation" of the items in the closing statement it disputes.  Agreement, Section 2.8(e).  The provision further directs the arbitrator to make a decision "in accordance with GAAP."  Agreement, Section 2.8(e)(y).

The question I am faced with is whether the declarations sought by Manifest are "on [their] face within the purview of" this narrow arbitration clause.  <u>Twin City Monorail, Inc. v. Robbins & Myers, Inc.</u>, 728 F.2d 1069, 1073 (8th Cir. 1984), quoting <u>McAllister Bros. v. A & S Transp. Co.</u>, 621 F.2d 519, 522 (2d Cir. 1980); <u>Cummings v. FedEx Ground Package Sys., Inc.</u>, 404 F.3d 1258, 1262 (10th Cir. 2005).

Given the specific language of the arbitration provision, drafted by Manifest, I decline to accept Manifest's invitation to declare the "purpose" of the working capital adjustment or require the arbitrator to apply an accounting methodology consistently between June 30 and August 2.

The provision directs the arbitrator to resolve the "disputed items" raised in Manifest's objections. In its objections to Random House's closing statement, Manifest complains, "[t]he contract requires that the parties utilize a consistent methodology for purposes of any adjustment to this item between June 30, 2006 and the closing date." Palgon Decl., Ex. 4. Accordingly, the declarations Manifest seeks are ultimately questions for the arbitrator as he or she is the person designated by the parties to resolve Manifest's objections to the closing statement.

Furthermore, I am persuaded by a decision issued by the Fourth Circuit Court of Appeals, Elox Corp. v. Colt Indust., Inc., 952 F.2d 395 (4th Cir. 1992).[5] In that case, the purchase price adjustment referred to the arbitrator "any issue relating to the determination of the Closing Adjustments." 952 F.2d at *1. The seller refused to arbitrate unless the buyer agreed that "the scope of the arbitration should be limited to the change in circumstances between the November 22, 1987, balance sheet and the January 7, 1988, closing date." Id. at *3. The court held:

> In this case, [the dispute resolution provision] specified that all issues related to the *determination* of the closing adjustments were to be decided by an accounting firm. The dispute over whether the amounts at issue are properly considered closing adjustments is properly classified as an issue relating to the determination of closing adjustments. Disagreements related to the scope of arbitration are resolved in favor of arbitration. . . . Further, closing adjustments are not expressly limited to changes in circumstances between the balance sheet and closing date in [the dispute resolution provision]. Therefore, this issue falls within the arbitration clause, and the district court correctly declined to hold a trial on it.

Id. (emphasis in original) (internal citations omitted).

Manifest is right to point out that the provision in Elox was slightly broader than the language at issue here, in that it provided the arbitrator with jurisdiction over "all issues related to the determination of the closing adjustments," as opposed to "unresolved disputed items"

[5]A copy of this opinion is attached to Random House's Memorandum as Exhibit 1.

raised by Manifest in its objection notice.  Nevertheless, the provision at issue here is sufficiently broad to cover the dispute.  As I note above, the very "unresolved disputed item" raised by Manifest in its objection notice is its demand that accounting methodologies be applied on a consistent basis.  Accordingly, its requested declarations are "properly classified" as "unresolved disputed items" and are subject to arbitration.

Finally, other than the implicit requirement that the arbitrator apply all of the requirements of the Agreement, Section 2.8(e) contains no limitations on how the arbitrator may apply GAAP in resolving the disputed closing statement items.  This ensures that the expert arbitrator, not the court, will apply GAAP thereby upholding the parties' agreement.

Manifest contends that the arbitration provision is a "carve-out" from the primary dispute resolution clause.  That dispute resolution clause provides:

> Governing Law.  The validity, meaning and effect of this Agreement shall be determined in accordance with the laws of the State of Oregon applicable to contracts made and to be performed in that state.  In connection with any legal action or other proceeding brought to enforce or interpret the terms of this Agreement or any Related Document, the parties consent to the exclusive jurisdiction and venue of the state and federal courts located in the city of Portland in the State of Oregon.

Agreement, Section 9.9.  This broad dispute provision, however, does not swallow the arbitration provision, and I conclude that the dispute here falls within the purview of the narrow arbitration provision.

III.   Additional Considerations About the Scope of the Arbitration Provision

Despite my conclusion above that the dispute is arbitrable, I note that "a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration."  First Options of Chi., 514 U.S. at 945.  As Manifest properly points out, the arbitration clause is very

narrow, and does not contain language extending arbitration to all disputes "arising out of" the

working capital adjustment provision.  The provision covers only "those items in the Closing

Statement which [Manifest] disputes."  Agreement, Section 2.8(e).  Accordingly, "though even a

narrow arbitration clause must be construed in light of the presumption in favor of arbitration, the

court is not free to disregard the explicit boundaries set by the agreement between the parties."

Gestetner Holdings, PLC v. Nashua Corp., 784 F. Supp. 78, 81 (S.D.N.Y. 1992) (quoting

Chevron U.S.A. Inc. v. Consolidated Edison Co., 872 F.2d 534, 537 (2d Cir. 1989)).  Here,

Manifest did not agree to arbitrate any items in its pre-closing statement, only its disputes over

the contents of the closing statement.  In sum, if Random House disputes the contents of the pre-

closing statement, it must raise those issues in court, not in arbitration.

Faced with a similar problem, a court in the Southern District of New York provided

some guidance to the arbitrator about how to approach a pre-closing statement that could not be

challenged by the buyer when the parties disputed the contents of the closing statement.  It court

instructed as follows:

> The Court will not prevent the arbitrator from analyzing the [pre-closing] balance
> sheet, and indeed assumes that the arbitrator will do so, to the extent necessary to
> determine its impact on the [closing] balance sheet.  The arbitrator shall determine
> whether the [closing] balance sheet is in accord with the Agreement.  If in doing
> so the arbitrator determines that the [pre-closing] balance sheet does not comply
> with the Agreement, the arbitrator shall not alter the findings of the [pre-closing]
> balance sheet, unless the parties agree otherwise.  However, the arbitrator need not
> be constrained to reapply any incorrect procedures to the [closing] balance sheet,
> but shall be free to apply the correct standards as dictated by the Agreement.

Stena Line (U.K.) Limited v. Sea Containers Ltd., 758 F. Supp. 934, 938-39 (S.D.N.Y. 1991).

In sum, the Agreement contains an arbitration provision which gives jurisdiction to an

arbitrator to resolve the "disputed items" raised in Manifest's objection notice, which includes

the declarations sought by Manifest in this action, but not items in the pre-closing statement.  I

grant the Motion to Compel Arbitration.

## CONCLUSION

Based on the foregoing, Random House's Motion to Strike Declaration of Wesley Price

(#45) is DENIED, and its Motion to Compel Arbitration, Appoint an Arbitrator, and Dismiss

Action (#9) is GRANTED in part and DENIED in part.  By this Opinion and Order, the parties

are compelled to arbitrate their dispute, with the limitations discussed above, and an arbitrator

will be appointed at an upcoming telephone conference.  Pursuant to the joint request of the

parties, the action will be STAYED pending the outcome of arbitration.  However, at the

telephone conference the court will consider any arguments about whether issues surrounding the

pre-closing statement must be resolved prior to arbitration.  The Motion for Summary Judgment

(#14) is denied as moot, with leave to renew later if necessary.

IT IS SO ORDERED.

Dated this _____2nd_____ day of July, 2007.


____/s/ Garr M. King_____
Garr M. King
United States District Judge